CATALINA HOLDINGS (BERMUDA) LIMITED,

Petitioner,

v.

ROBERT H. MURIEL, Director of Insurance of the State of Illinois, as Liquidator of Legion Indemnity Company,

Respondent.

Case No. 18-cv-05642

Judge Martha M. Pacold

## MEMORANDUM OPINION AND ORDER

Petitioner Catalina Holdings (Bermuda) Ltd. ("Catalina") moves for confirmation of an arbitration award. Respondent Robert H. Muriel, Acting Director of Insurance of the State of Illinois ("the Director"),[1] in his capacity as the statutory and court affirmed Liquidator of Legion Indemnity Company, moves to vacate or modify the award. For the following reasons, the court grants Catalina's petition for confirmation of the award and denies the Director's motion to vacate or modify the award.

## Background[2]

Legion Indemnity Company entered into a series of reinsurance treaties with Alea Group Limited, under which Legion ceded claims to Alea. (Dkt. 25-2 at 3-4.)[3] Legion was placed into receivership by Illinois court order in 2003, and the Director was appointed as liquidator. (Dkt. 40-2 at 2.) In 2013, Catalina (a Bermuda

---

[1] Currently Robert H. Muriel; previously Jennifer Hammer.

[2] The court assumes familiarity with the prior judge's Memorandum Opinion and Order denying the Director's motion to dismiss. *See Catalina Holdings (Bermuda) Ltd. v. Hammer*, 378 F. Supp. 3d 687, 690-91 (N.D. Ill. 2019) (Shah, J.). The decision describes the facts, *id.* at 690-91, so the court reviews them only briefly here. The decision also explains that the court has subject matter jurisdiction over this case under 9 U.S.C. § 203 and 28 U.S.C. § 1332(a)(2). *Id.* at 691 & n.3.

[3] Docket entries are cited as "Dkt. [docket number]" followed by the page or paragraph number, as needed. Page number citations refer to the ECF page number.

company with its principal place of business in the United Kingdom) bought Alea and assumed responsibility for the relevant treaties. In 2014, the Director sent Catalina a commutation offer reflecting a balance owed of roughly $1 million. (Dkt. 25-2 at 4.) Catalina declined to pay.

The Director demanded arbitration against Catalina and other reinsurers of claims under various reinsurance "Programs" governed by "Reinsurance Treaties." (Dkt. 25-1 at 1-2, 4 ("Under the Arbitration Clause of the Reinsurance Treaties, the parties agreed to submit any disputes relating to the agreements to binding arbitration.").) In the demand for arbitration, the Director asked the panel to award all amounts owed to the Director under the Reinsurance Treaties, "attorneys' fees, arbitration costs and interest," and "such further relief as the Panel deems just." (Dkt. 25-1 at 4.)

The arbitration at issue here involved six treaties for which Catalina (not other reinsurers) had assumed responsibility.[4] For reasons explained below, for purposes of this decision, the court considers the arbitration clause in four of the six treaties. The court refers to the four treaties collectively as the "Treaties" or the "Aon Treaties."

In its position statement, filed before the arbitration hearing, Catalina asked the Panel to, among other things, declare the amount of premium owed to Catalina, award "costs and fees associated with this arbitration," and award "any other relief

---

[4] The six treaties consisted of the following: (1) Contractors Wrap-Up/Projects and Discontinued Completed Operations Casualty Quota Share Reinsurance Agreement, effective January 1, 2000 through January 1, 2001; (2) Contractors Wrap-Up/Projects and Discontinued Completed Operations Casualty Quota Share Reinsurance Agreement, effective January 1, 2001 through January 1, 2002; (3) General Contractors and Sub-Contractors Casualty Quota Share Reinsurance Agreement, effective January 1, 2001 through January 1, 2002; (4) Contractors Excess Wrap-Up Quota Share Reinsurance Agreement, effective January 1, 2000 through January 1, 2001; (5) Casualty Quota Share Reinsurance Agreement (A.C.T. Preferred Residential, U.S. Risk Underwriters), effective July 1, 2000 through July 1, 2001; and (6) the Mobile Crane Rental Program Excess of Loss Reinsurance Agreement, effective March 1, 2000 through February 28, 2001. (*See* Dkt. 40-2 at 1-2 (Initial Final Award, listing Treaties (1)-(4) and (6) as the treaties in dispute; Dkt. 40-4 at 1 (Final Award, clarifying that Treaty (5) "was inadvertently omitted" from, and should have been included in, the Initial Final Award's list of treaties in dispute).)

The court refers to Treaties (1)-(4) collectively as the "Treaties" or the "Aon Treaties" (and, for reasons explained below, considers the arbitration clause in those four treaties for purposes of this decision). Like Treaties (1)-(4), Treaty (5) may have been brokered by Aon; as explained below, the court does not consider Treaty (5) in the analysis. The court refers to Treaty (6) as the "Guy Carpenter Treaty"; as explained below, the court does not consider the Guy Carpenter Treaty in the analysis.

the Panel deems to be just and proper." (Dkt. 25-2 at 10.) The hearing was held in Chicago before a panel of three arbitrators from June 12-14, 2018.

After the hearing, on June 21, 2018, the panel issued an "Initial Final Award," which found in Catalina's favor with respect to the Director's claims, awarded Catalina $76,602.63 in unpaid premiums, and granted Catalina "an adverse award of fees and costs incurred in these proceedings." (Dkt. 40-2 at 2-4.) The panel directed Catalina to submit copies of its invoices and provided the Director with the opportunity to respond. After receiving submissions from both parties, on July 31, 2018, the panel issued its "Final Award," which incorporated the "Initial Final Award" and granted Catalina an additional $437,501.04 in "costs," which consisted of attorneys' fees and expenses. (Dkt. 40-4 at 1-2.)

Catalina filed a petition to confirm the award. The Director filed a motion to dismiss, which was denied on March 22, 2019. *See Catalina Holdings (Bermuda) Ltd. v. Hammer*, 378 F. Supp. 3d 687, 689 (N.D. Ill. 2019) (Shah, J.). Subsequently, the Director brought this motion to vacate or modify the Final Award, challenging the panel's award of attorneys' fees. (Dkt. 40.)

## Discussion

## I. Catalina's Motion to Confirm the Award
## and the Director's Motion to Vacate or Modify the Award

Catalina moves to confirm the award, relying on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, and the Federal Arbitration Act (FAA). The Director moves to vacate or modify the award under the FAA.

Catalina seeks confirmation under both 9 U.S.C. § 9 (part of the original FAA) and 9 U.S.C. § 207 (part of the chapter of the FAA that implements the Convention). The court discusses both the original FAA and the Convention below, but ultimately the parties agree that the same standards apply under either analysis.

Section 9 is part of Chapter 1 of the FAA, 9 U.S.C. §§ 1-16. "Chapter 1 codifies the original Federal Arbitration Act of 1925, 43 Stat. 883; it applies to all domestic awards and to all other awards not otherwise covered by another legal instrument." *Johnson Controls, Inc. v. Edman Controls, Inc.*, 712 F.3d 1021, 1024 (7th Cir. 2013). Under Section 9, the court "must" confirm the award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9.

The Director moves to vacate the award under Section 10(a)(4), 9 U.S.C. § 10(a)(4), or to modify the award under Section 11(b), 9 U.S.C. § 11(b). Section

10(a)(4) allows a court to vacate the award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Under Section 10(a), a court "may vacate an arbitration award *only in narrowly defined cases,* one of which exists when an arbitrator's award exceeds his authority" under § 10(a)(4). *Am. Postal Workers Union, AFL-CIO, Milwaukee Local v. Runyon*, 185 F.3d 832, 835 (7th Cir. 1999) (emphasis added); *see also Affymax, Inc. v. Ortho-McNeil-Janssen Pharm., Inc.*, 660 F.3d 281, 284 (7th Cir. 2011) ("Disregard of the law is not on the statutory list."). Section 11(b) allows a court to modify or correct the award "[w]here the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted." The Seventh Circuit has interpreted Sections 10(a)(4) and 11(b) (and Article V(1)(c) of the Convention, as noted below), to allow "a defense that part of the award was based on a matter that had not been submitted to the arbitrator." *Lander Co. v. MMP Invs., Inc.*, 107 F.3d 476, 481 (7th Cir. 1997).

Section 207 is part of Chapter 2 of the FAA. "Chapter 2 implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, commonly called the New York Convention. *See* 9 U.S.C. § 201." *Johnson Controls*, 712 F.3d at 1024; *see also Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*, 444 F. Supp. 2d 909, 913 (N.D. Ill. 2006) (discussing Chapter 1 and Chapter 2). Under Section 207, "the court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207. Article V of the Convention specifies grounds for refusal of recognition or enforcement of the award. 21 U.S.T. 2517, 1970 WL 104417, at *2. *See, e.g., id.*, Article V(1)(c) ("The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration . . . ."), Article V(1)(e) ("The award . . . has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.").

The Seventh Circuit has noted that it is "not clear whether a party may bring an action under Chapter 1 to vacate an award issued by an arbitrator in a U.S. jurisdiction, but governed by the Convention." *Johnson Controls*, 712 F.3d at 1025. However, as noted above, the Seventh Circuit has explained that, when comparing §§ 10(a)(4) and 11(b) with Article V(1)(c), "[t]he wording is slightly different but there is no reason to think the meaning different"; "both the Federal Arbitration Act and the Convention" allow "a defense that part of the award was based on a matter that had not been submitted to the arbitrator." *Lander*, 107 F.3d at 481. Thus, the choice of whether to proceed under FAA Chapter 1, on the one hand, or the Convention and FAA Chapter 2, on the other, does not make a difference in this case. *See Johnson Controls*, 712 F.3d at 1025. Catalina agrees that there is no need to decide the issue. (Dkt. 41 at 4 n.5.) The court declines to reach it.

The Director moves to vacate the award under Section 10(a)(4) or to modify the award under Section 11(b).[5]  The court addresses these provisions in turn.

## A. The Panel Did Not Exceed Its Contractual Authority

First, the Director cites Section 10(a)(4) and argues that the panel exceeded its authority by awarding attorneys' fees on a noncontractual basis.

Section 10(a)(4), in relevant part, allows a court to vacate the award "where the arbitrators exceeded their powers."  "An agreement to arbitrate is an agreement to move resolution of the parties' disputes out of the judicial system." *Hyatt Franchising, L.L.C. v. Shen Zhen New World I, LLC*, 876 F.3d 900, 902 (7th Cir. 2017).  "Arbitration implements contracts," *Affymax, Inc. v. Ortho-McNeil-Janssen Pharm.*, Inc., 660 F.3d 281, 284 (7th Cir. 2011), and "the question for decision by a federal court asked to set aside an arbitration award . . . is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract," *id.* at 286 (citation and internal quotation marks omitted).  "A reviewing court will enforce the arbitrator's award so long as it draws its essence from the contract, even if the court believes that the arbitrator misconstrued its provisions." *United Food & Commercial Workers, Local 1546 v. Illinois Am. Water Co.*, 569 F.3d 750, 754 (7th Cir. 2009) (citations and internal quotation marks omitted).  The Seventh Circuit has further explained:

> [I]t is difficult to overturn an arbitral award.  We uphold an award so long as an arbitrator is even arguably construing or applying the contract and acting within the scope of this authority.  We will not overturn an award because an arbitrator committed serious error, or the decision is incorrect or even whacky.
>
> In the context of labor awards, we have said that the only time when we will disrupt an award is if we find the arbitrator effectively dispenses his own brand of industrial justice because there is no possible interpretive route to the award.  The same approach applies to commercial arbitration.

*Johnson Controls,* 712 F.3d at 1025–26 (citations and internal quotation marks omitted); *see also Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 706 (7th Cir. 1994) ("Judicial review of arbitration awards is tightly limited; perhaps it ought not be called 'review' at all. By including an arbitration clause in their contract the

---

[5] The Director withdrew its arguments that (1) the award should be vacated under Section 10(a)(4) because the award manifestly disregarded the law and (2) the award should be modified under Section 11(b) to eliminate unreasonable attorneys' fees, *i.e.*, to reduce the amount of fees.  (Dkt. 42 at 2 n.3.)

parties agree to submit disputes arising out of the contract to a nonjudicial forum, and we do not allow the disappointed party to bring his dispute into court by the back door, arguing that he is entitled to appellate review of the arbitrators' decision.").

With regard to remedies, "[i]t is commonplace to leave the arbitrators pretty much at large in the formulation of remedies, just as in the formulation of the principles of contract interpretation. . . . Silence implies—given the tradition of allowing arbitrators flexible remedial discretion—the absence of categorical limitations." *Baravati*, 28 F.3d at 710; *see also George Watts & Son, Inc. v. Tiffany & Co.*, 248 F.3d 577, 581 (7th Cir. 2001) (The parties "could have agreed to arbitrate under provisions forbidding the arbitrator to split the difference, requiring the prevailing side to receive 100% of its legal entitlements. An arbitrator's disregard of such a command would be reviewable under 9 U.S.C. § 10(a)(4). When the parties agree to arbitrate without specifying a rule of decision, . . . then the arbitrator has considerable leeway so long as he respects the limits the parties' contract and public law place on his discretion."). While the Seventh Circuit has "agree[d] with the general proposition that the arbitration panel would exceed its authority if it provided an award which the agreement explicitly excluded as an option," *Yasuda Fire & Marine Ins. Co. of Europe, Ltd v. Cont'l Cas. Co.*, 37 F.3d 345, 351 (7th Cir. 1994), it has also explained:

> [W]e would be remiss if we did not emphasize how important a wide range of remedies is to successful arbitration. Although parties to arbitration agreements may not always articulate specific remedies, that does not mean remedies are not available. If an enumeration of remedies were necessary, in many cases the arbitrator would be powerless to impose any remedy, and that would not be correct. Since the arbitrator derives all his powers from the agreement, the agreement must implicitly grant him remedial powers when there is no explicit grant.

*Id.* (citations and internal quotation marks omitted).

The award here satisfies these deferential standards.

First, the panel's Initial Final Award and Final Award reflect that the panel was aware of the relevant portions of the arbitration clauses and made a considered, good faith effort to apply them. To explain this conclusion, the court walks through the relevant portions of the Initial Final Award and Final Award in some detail. The Initial Final Award reviewed factual background and the arbitration process to date, ruled in favor of Catalina on the merits, and then addressed attorneys' fees as follows:

4. In light of all these factors, the Panel has determined that it is unreasonable for Respondent to bear the costs of having to respond to and defend this arbitration brought by Petitioner and hereby grants an adverse award of fees and costs incurred in these proceedings except for (a) the fees and expenses of the Arbitrators, which shall be dealt with as provided for in the applicable Arbitration Clauses, namely that each party bear the expense of its own arbitrator and share equally in the expense of the Umpire; and (b) the expense of the arbitration (namely, the disbursements incurred for court reporting, food and any other communal items related to the hearing), which shall be shared equally by the parties, likewise as provided in the applicable Arbitration Clauses.

5. Within the next ten (10) business days, Respondent is directed to submit to Petitioner and the Panel copies of the legal invoices in relation to which fees and expenses are claimed, identifying the name of the person providing services, the time entries for the services rendered, the rate charged for the person providing services and a description of the services provided, subject to redaction of entries describing legal work performed. Within five (5) business days following Respondent's submission, Petitioner shall respond thereto and if any objection is raised, Respondent shall have five (5) business days to reply. The Panel will issue its Final Award thereafter.

(Dkt. 40-2 at 4 ¶¶ 4-5.)

The parties filed the submissions as directed. Catalina filed a "Recapitulation of Fees and Expenses" itemizing the claimed attorneys' fees. (Dkt. 40-3.) The Director filed a substantive response requesting that the panel vacate the attorneys' fee award, making legal arguments that the panel exceeded its authority under Illinois law and the contract language and that the attorneys' fees grossly misapplied Illinois law, and seeking in the alternative a reduction in the amount of attorneys' fees. (Dkt. 40-5.) Catalina filed a substantive reply in support of the attorneys' fee award, making legal arguments based on the Director's filings in the arbitration, the contract language, and Illinois law. (Dkt. 40-6.)

The panel then issued the Final Award. The Final Award "reaffirm[ed] and incorporat[ed]" the Initial Final Award. (Dkt. 40-4 at 1.) As to attorneys' fees, the Final Award stated:

3. In the Initial Final Award the Panel awarded Respondent, as items 4 and 5, the recoupment of its costs (namely fees and expenses) associated with this arbitration, pursuant to which, on June 28, 2018, Respondent submitted invoices for legal fees and expenses, supplemented on July 23, 2018 by a

Declaration of Respondent's duly authorized representative affirming that it has paid the legal fees and expenses claimed and incurred further costs in excess of the total claimed. On July 6, 2018, Petitioner submitted its opposition, to which, on July 13, 2018, Respondent duly replied.

4. Following due consideration of the positions and arguments set forth in the papers submitted by the Parties and following due deliberation, the Panel, by majority, hereby awards Respondent the amount of $437,501.04 in costs, to be paid by Petitioner within thirty (30) calendar days from the date of this Final Award, failing which post-judgment interest will accrue at the rate of six percent (6%) per annum, compounded quarterly, until full and final payment has been effected.

(Dkt. 40-4 at 1-2 ¶¶ 3-4.)

The question before the court is whether the arbitrators arguably interpreted the Treaties, not whether they erred in interpreting the Treaties. The Interim Final Award, the parties' submissions to the arbitrators in response, and the Final Award reflect that the arbitrators engaged with the relevant portions of the Treaties. The Interim Final Award expressly cited "the applicable Arbitration Clauses" with respect to "the fees and expenses of the Arbitrators" and "the expense of the arbitration." (Dkt. 40-2 at 4 ¶ 4.) The Initial Final Award also directed submissions from the parties on the topic of attorneys' fees, starting with Catalina's submission of "copies of the legal invoices in relation to which fees and expenses are claimed," and providing an opportunity for the Director to respond and for Catalina to reply. (*Id.* at 4 ¶ 5.) In response, the parties submitted substantive legal arguments based on both Illinois law and the Treaties. The panel issued the Final Award "[f]ollowing due consideration of the positions and arguments set forth in the papers submitted by the Parties and following due deliberation." (Dkt. 40-4 at 2 ¶ 4.) In short, the arbitrators reviewed the relevant arbitration clauses, invited submissions that presented substantive arguments about their authority to award fees, and reached a considered decision based on those arguments. Based on this sequence of events alone, it would be difficult to conclude that the arbitrators did not even arguably interpret the Treaties.

Nonetheless, the Director argues that other language in the panel's awards shows that the contract language was not the basis of the panel's decision to award attorneys' fees, and that regardless of what the panel said, it *must* have exceeded its contractual authority since no possible basis existed under the contract language for an award of attorneys' fees. "Because the arbitrator is typically limited to interpreting the contract, if there is no possible interpretive route to the award, then a noncontractual basis can be inferred and the award set aside." *United States Soccer Fed'n, Inc. v. United States Nat'l Soccer Team Players Ass'n*, 838 F.3d 826, 832 (7th Cir. 2016) (citation and internal quotation marks omitted); *see also id.* at 835–36 (award vacated when "the arbitrator ignored, rather than misunderstood,

the express terms" of the agreement).  Bearing in mind that the court does not review the award for factual or legal error, the court turns to the contract language and the award in order to assess whether there is no possible interpretive route to the award or whether the arbitrators ignored, rather than misunderstood, the express terms of the Treaties.

First, however, the court explains which contracts it is considering for purposes of this assessment and why.  The court considers the arbitration clause in the four Treaties (or "Aon Treaties," Treaties (1)-(4) described in n.4 above).  The parties do not dispute that those Treaties contain an identical arbitration clause.[6]

Treaty (5) in n.4 above[7] consists only of a cover note and slip.  (Dkt. 25-4 at 7, 18.)  Catalina argues that means that the parties agreed to have an arbitration clause, while deferring the agreed wording to the future.  (Dkt. 41 at 3 & n.3.)  But the court need not reach this question or include Treaty (5) in its analysis of the motion to vacate, as the Director did not mention or rely on Treaty (5) in the motion and thus waived any argument based on it.  *Laborers' Pension Fund v. Murphy Paving & Sealcoating, Inc.*, No. 16-cv-08043, 2020 WL 1491143, at *4 n.4 (N.D. Ill. Mar. 27, 2020) ("arguments raised for the first time in a reply brief are waived") (citation and internal quotation marks omitted).  Because Catalina raised Treaty (5) in the opposition (Dkt. 41 at 2 n.1), the Director made a one-sentence argument about it in the reply and explained in an accompanying footnote why Treaty (5) was not attached to the motion.  (*See* Dkt. 42 (reply) at 3-4.)  But any potential arguments based on this treaty have not been sufficiently developed in the briefing for the court to address them.  *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *Laborers' Pension Fund*, 2020 WL 1491143, at *4 n.4 ("[U]nsupported and underdeveloped arguments are waived.") (citation and internal quotation marks omitted).

As to the Guy Carpenter Treaty (Treaty (6) in n.4 above), the parties dispute which version of this treaty is controlling.[8]  The court does not need to decide this

---

[6] The Director filed copies of three of the four Treaties (Treaties (1), (3), and (4)).  (Dkt. 40-1 at 1-70.)  Treaty (2) does not appear to be included in the filing, but the parties do not dispute that its arbitration clause is identical to those of Treaties (1), (3), and (4).

[7] As mentioned in n.4, Treaty (5), like Treaties (1)-(4), may also have been brokered by Aon.

[8] Catalina argues that, like Treaty (5), the only agreed documents for the Guy Carpenter Treaty during arbitration were the cover note and slip.  (*See* Dkt. 41 (Catalina's opposition to motion to vacate) at 2 n.2; Dkt. 25-5 at 3, 8 (cover note and slip).)  There is no actual arbitration clause in the cover note and slip; the word "Arbitration" merely appears in a list of "General Conditions."  (Dkt. 25-5 at 3, 8.)  Catalina argues that, as with Treaty (5), this means that the parties agreed to have an arbitration clause, while deferring the agreed wording to the future.  (Dkt. 41 at 3 & n.3.)  The Director, on the other hand, contends that the actual text of the Guy Carpenter Treaty was located and entered into evidence during

9

issue or consider the Guy Carpenter Treaty in its analysis of the motion to vacate, because the Director waived arguments about the treaty before both the court and the panel.

Before the court, in the motion to vacate or modify, the Director referred to the Aon Treaties and the Guy Carpenter Treaty collectively as the "Treaties" (Dkt. 40 at 2) and focused mainly on the text of the Aon Treaties (*id.* at 2, 5-6). The Director did mention the Guy Carpenter Treaty in a footnote in the motion, and again briefly in the reply. (Dkt. 40 (motion) at 6 n.2 ("The arbitration was also partially based on the Guy Carpenter Treaty, which unlike the Aon Treaties, provides no basis for the Panel to even award interest and costs."); Dkt. 42 (reply) at 3-4.) However, the Director did not develop this point in any meaningful way, quote or discuss the text of the Guy Carpenter Treaty in any detail, or address potential issues that would need to be addressed for the court to give the treaty informed consideration.[9] Any potential arguments based on the Guy Carpenter Treaty have not been sufficiently developed in the briefing for the court to address them. *See M.G. Skinner*, 845 F.3d at 321; *Laborers' Pension Fund*, 2020 WL 1491143, at *4 n.4.

Similarly, the only mention of the Guy Carpenter Treaty in the Director's brief to the panel about attorneys' fees appears to be the one-sentence footnote, "This arbitration is also partially based on the Guy Carpenter Treaty, which unlike the Aon Treaties, provides no basis for the Panel to even award interest and costs." (Dkt. 40-5 at 4 n.2.) This did not meaningfully present the argument to the panel. *Cf. Ganton Techs., Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., U.A.W., Local 627*, 358 F.3d 459, 462 (7th Cir. 2004) (when "briefs to the arbitrator omitted any mention" of a term, stating that "[t]he failure to pose

the hearing. (Dkt. 42 at 4 n.6 (Director's reply); Dkt. 42-1 (discovery correspondence attaching "Mobile Crane Rental Program Quota Share Reinsurance Contract"); Dkt. 42-2 at 2 (June 13, 2018, hearing transcript excerpt in which the Director's counsel states that "Counsel for the parties yesterday received the treaty from Guy Carpenter for the Mobile Crane program. There is an agreement to submit that exhibit into evidence, so we will be supplementing by agreement the exhibits."). The Director filed that document here and contends that it is the controlling version of the Guy Carpenter Treaty. (Dkt. 40-1 at 71 ("Mobile Crane Rental Program Quota Share Reinsurance Contract").)

[9] The potential issues include, for example: how should the court approach the Guy Carpenter Treaty version dispute consistent with the court's limited role under the FAA, which does not include fact finding or review for factual or legal error; what would be the implications from the specific text of either version of the Guy Carpenter Treaty, if it were controlling; and what would be the consequences if the court were to conclude that the arbitrators exceeded their authority with respect to the Guy Carpenter Treaty or the Aon Treaties but not the other (*e.g.*, what would be the proper remedy under the FAA; could either the Guy Carpenter Treaty or the Aon Treaties provide independent authority to support the entire attorneys' fees award; if not, could the attorneys' fees be allocated among the treaties; if so, how).

an available argument to the arbitrator waives that argument in collateral proceedings to enforce or vacate the arbitration award").

In sum, the court limits the following analysis to the identical arbitration clause in the four Aon Treaties. That clause provides that "[t]he arbitrators may award interest and costs, but in no event will punitive (sometimes called 'enhanced compensatory') or exemplary damage be awarded." (Dkt. 40-1 at 15, 42, 61.) The dispute turns mainly on that sentence, but other excerpts from the arbitration clause provide further context:

ARBITRATION

As a condition precedent to any right of action hereunder, any dispute or difference between the Company and any Reinsurer relating to the interpretation or performance of this Agreement, including its formation or validity, or any transaction under this Agreement, whether arising before or after termination, will be submitted to binding arbitration, with the exception of matters requiring resolution by way of injunctive relief.

Upon written request of a Reinsurer or the Company, each will choose an arbitrator and the two chosen will select a third arbitrator. . . . All arbitrators will be impartial active or former executive officers of insurance or reinsurance companies or Underwriters at Lloyd's, London, and disinterested in the outcome of the arbitration. . . .

. . .

The arbitrators will have the power to determine all procedural rules for the holding of the arbitration including but not limited to inspection of documents, examination of witnesses, and any other matter [*sic*] relating to the conduct of the arbitration. The arbitrators will interpret this Agreement as an honorable engagement and not as merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law. The arbitrators may award interest and costs, but in no event will punitive (sometimes called "enhanced compensatory") or exemplary damage be awarded. Each party will bear the expense of its own arbitrator and will share equally with the other party the expense of the third arbitrator and of the arbitration.

Arbitration hereunder will take place in Philadelphia, Pennsylvania, unless both parties otherwise agree. Except as hereinabove provided, the arbitration will be in accordance with the

rules and procedures established by the Uniform Arbitration Act as enacted in Pennsylvania.

(Dkt. 40-1 at 15.)

Focusing first on the word "costs," the court cannot conclude that there is no possible interpretive route to the award of attorneys' fees. The Final Award states: "In the Initial Final Award the panel awarded Respondent, as items 4 and 5, the recoupment of its costs (namely fees and expenses)." (Dkt. 40-4 at 1 ¶ 3.) Thus, it is easy to see the panel's interpretive route. The Treaties allowed the panel to award "costs," and that is what the panel did. *Cf. Prostyakov v. Masco Corp.*, 513 F.3d 716, 725 (7th Cir. 2008) ("because we can easily discern the 'interpretive route' Hittle followed when fashioning the award, it is not our place to determine whether his interpretation was correct as a matter of law"); *Prudential-Bache Sec., Inc. v. Tanner*, 72 F.3d 234, 242–43 (1st Cir. 1995) (reading "'costs and expenses, unless applicable law directs otherwise' . . . to include attorney's fees"); *Urquhart v. Kurlan*, No. 16-cv-02301, 2017 WL 781742, at *5 (N.D. Ill. Feb. 28, 2017) ("the arbitrators could potentially have awarded the attorneys' fees pursuant to the CBOE arbitration rule that allows arbitrators to award 'other costs and expenses,' which mirrors New York Stock Exchange rules that have been interpreted in such a manner"). Parties can contract to shift fees or not to shift fees. *See, e.g.*, *Johnson Controls*, 712 F.3d at 1027; *Watts*, 248 F.3d at 581. The arbitrators could have interpreted "costs" to include fees here. Since there is "contractual language on which to hang the label of ambiguous," this court will not review the panel's interpretation of that language for error. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993).

Reading "costs" not to include attorneys' fees could have been an available interpretation too, since the arbitration clause does not expressly mention attorneys' fees, expressly prohibits punitive damages, and requires each party to "bear the expense of its own arbitrator" and "share equally with the other party the expense of the third arbitrator and of the arbitration." (Dkt. 40-1 at 15, 42, 60-61.) But that was an alternative interpretation, not the only possible interpretation, and it is not the court's role to review the panel's choice for error.

Other features of the arbitration clause reinforce that this particular clause offers more than sufficient room to interpret "costs" to include attorneys' fees:

- The clause is broad, encompassing "any dispute or difference between the Company and any Reinsurer relating to the interpretation or performance of this Agreement."

- The clause designated as arbitrators insurance executives, who might not necessarily be attorneys and who thus might not necessarily be steeped in the American Rule, the English Rule, or other principles related to

attorneys' fees. *Cf. Lefkovitz v. Wagner*, 395 F.3d 773, 780 (7th Cir. 2005) ("Arbitrators are not professional judges; often they are not lawyers at all, though this one was. Parties that opt for arbitration trade the formalities of the judicial process for the expertise and expedition associated with arbitration, a less formal process of dispute resolution by an umpire who is neither a generalist judge nor a juror but instead brings to the assignment knowledge of the commercial setting in which the dispute arose.").

- The clause instructs the panel to "interpret this Agreement as an honorable engagement and not as merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law." *See Watts*, 248 F.3d at 581; *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, No. 04-cv-05852, 2009 WL 3126288, at *4 (N.D. Ill. Sept. 24, 2009) (noting that "[t]he arbitration agreement in this case grants the panel broad authority" and quoting "honorable engagement" language); *Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 262 (2d Cir. 2003) ("Where an arbitration clause is broad, as here, arbitrators have the discretion to order remedies they determine appropriate, so long as they do not exceed the power granted to them by the contract itself."); *First State Ins. Co. v. Nat'l Cas. Co.*, 781 F.3d 7, 12 (1st Cir. 2015) ("We believe that an honorable engagement provision empowers arbitrators to grant forms of relief, such as equitable remedies, not explicitly mentioned in the underlying agreement."); *but see PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*, 400 F. App'x 654, 656 (3d Cir. 2010) ("[t]hat the honorable engagement clause permitted the arbitrators to stray from judicial formalities did not give them authority to reinvent the contract before them, or to order relief no one requested").

All these features of the clause could potentially open the door to the arbitrators' interpreting "costs" to include attorneys' fees, especially since "[i]t is commonplace to leave the arbitrators pretty much at large in the formulation of remedies . . ." *Baravati*, 28 F.3d at 710; *see also Yasuda Fire & Marine*, 37 F.3d at 351 ("we would be remiss if we did not emphasize how important a wide range of remedies is to successful arbitration").

The Director argues that the treaties are silent as to attorneys' fees specifically (Dkt. 40 at 6), and that under "well-settled law," neither contractual silence nor provisions that allow for recovery of "costs" should be construed as allowing awards of attorneys' fees (Dkt. 42 at 7). *See Harter v. Iowa Grain Co.*, 220 F.3d 544, 559 (7th Cir. 2000) ("In Illinois, '[p]rovisions for attorney's fees are to be construed strictly, and such fees cannot be recovered for any services, unless so provided by the [contract].'") (citing *Northern Trust Co. v. Sanford*, 308 Ill. 381, 389–90, 139 N.E. 603 (1923)).

This argument is not convincing, for several reasons. First, it is a claim of legal error. Even if the panel committed legal error, the parties may not obtain "appellate review" of that decision through the "back door." *Baravati*, 28 F.3d at 706; *see also BEM I, L.L.C. v. Anthropologie, Inc.*, 301 F.3d 548, 555-56 (7th Cir. 2002) (discussing arbitrators' "award of prejudgment interest in apparent contradiction of the Illinois rule that limits such awards to cases in which the damages are a sum certain or readily calculable (as in a suit for the contract price)" and noting that "it is of no moment whether the arbitrators got Illinois law right—or very wrong").

Second, the Director does not argue that the Treaties required the panel to apply any specific source of law and disclaims reliance on the American Rule[10] or Illinois law.[11] (Dkt. 42 at 5-6.) "Disregard of the law" only comes within Section 10(a)(4) if it also amounts to "disregard of the contract that conveys the arbitrators' authority." *Affymax*, 660 F.3d at 285.

Third, given the Seventh Circuit cases cited above regarding "the tradition of allowing arbitrators flexible remedial discretion," *Baravati*, 28 F.3d at 710; *see also Yasuda Fire & Marine*, 37 F.3d at 351; *Watts*, 248 F.3d at 581, the absence of a specific mention of attorneys' fees in this particular arbitration clause does not mean the arbitrators exceeded their authority.

Fourth, when the Seventh Circuit has set aside awards by inferring a noncontractual basis of decision, the arbitrator ignored contractual language that was "clear, unambiguous, and *not silent.*" *United States Soccer Fed'n*, 838 F.3d 826, 833 (7th Cir. 2016) (emphasis in original); *see also Tootsie Roll Indus., Inc. v. Local Union No. 1*, 832 F.2d 81, 84 (7th Cir. 1987); *Anheuser–Busch, Inc. v. Beer Workers Local Union 744*, 280 F.3d 1133, 1140-42 (7th Cir. 2002). Here, the Treaties do not speak specifically to "attorneys' fees"; they leave room for the arbitrators to construe "costs" and to exercise their remedial discretion in doing so.

The Director contends that the attorneys' fees are punitive and that the panel ignored the express prohibition on punitive damages. This argument is not convincing either. The panel did not describe the award as punitive. Nor are awards of attorneys' fees necessarily punitive. *Cf. Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1257 (7th Cir. 1994) (noting that attorneys' fees "may be recovered under the common law as an element of compensatory damages in cases

---

[10] The Seventh Circuit has noted that "at least one other jurisdiction has rejected extension of the 'American Rule' to arbitration," but has not reached the question. *Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1257 (7th Cir. 1994) (citing *Tennessee Dep't of Human Servs. v. United States Dep't of Educ.*, 979 F.2d 1162, 1169 (6th Cir. 1992)).

[11] Likewise, the Director does not argue that the last sentence of the arbitration clause ("Except as hereinabove provided, the arbitration will be in accordance with the rules and procedures established by the Uniform Arbitration Act as enacted in Pennsylvania") has any significance.

where the defendant's tortious conduct proximately caused the plaintiff to incur them.") (quoting *Calcagno v. Personalcare Health Mgmt.*, 565 N.E.2d 1330, 1339 (1991)); *Certain Underwriters*, 2009 WL 3126288, at *5.[12]

The Director argues that language in the panel's awards shows that the Treaties were not the basis of the panel's decision to award attorneys' fees. In order to cast the attorneys' fees as punitive damages, the Director points to the panel's statement that it would be "unreasonable" for Catalina to "bear the costs of having to respond to and defend this arbitration." (Dkt. 40-2 at 4.) This piece of the panel's reasoning is too ambiguous to conclusively demonstrate that the Panel awarded the fees to punish the Director.

The Director also argues that the panel's statement that it was "unreasonable" for Catalina to pay the fees is proof that the panel relied on its "own notion of what is fair and equitable," rather than its interpretation of the Treaties. (Dkt. 40 at 5.) The court rejects this argument. The fact that the panel's analysis included an inquiry into reasonableness does not altogether rule out interpretation of the Treaties, especially considering the "honorable engagement" language. Since arbitrators are not required to explain their reasoning, this court will not construe ambiguous references as misconduct. *See Wilson v. Sterling Foster & Co.*, No. 98-cv-02733, 1998 WL 749065, at *6 n.15 (N.D. Ill. Oct. 15, 1998) (*citing Eljer*, 14 F.3d at 1254).

The Director also focuses on the fact that in the Initial Final Award, the panel used the term "fees and costs." By contrast, in the Final Award the panel says it awarded "costs (namely fees and expenses)." According to the Director, the final award's shift to describing "fees" as a subset of "costs" is evidence that the panel believed it had legal authority to award "costs," but not "fees." (Dkt. 40-4 at 1.) This difference in phrasing is not enough to demonstrate that the panel wholly failed to interpret the Treaties and instead dispensed its "own brand of industrial justice." *Johnson Controls*, 712 F.3d at 1025–26. Once again, "an arbitrator is simply not required to state the reasons for his decision." *Eljer*, 14 F.3d at 1254. Thus, "mere ambiguity" in the reasoning of the Final Award is "not grounds for vacating it." *Am. Postal Workers Union, AFL-CIO, Milwaukee Local v.*

---

[12] Catalina contends that "the Liquidator did not argue to the panel that the ban on the award of punitive damages prevented it from awarding attorneys' fees" and thus waived the argument. (Dkt. 41 at 11-12.) "The failure to pose an available argument to the arbitrator waives that argument in collateral proceedings to enforce or vacate the arbitration award." *Ganton Techs*, 358 F.3d at 462. The Director, however, wrote in the brief that "the plain language of the Treaties expressly prohibit an award of damages to punish Petitioner for filing this arbitration; stating, 'in no event will punitive (sometimes called 'enhanced compensatory') or exemplary damage be awarded." (Dkt. 40-5 at 5.) While the statement is in a section of the brief arguing that the attorneys' fee award grossly misapplied Illinois law, rather than the section arguing that the panel exceeded its authority, the court declines to find waiver.

*Runyon*, 185 F.3d 832, 836 n.3 (7th Cir. 1999) (citing *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598 (1960)).

Even assuming the shift in wording was deliberate, at most, the process by which the panel considered the attorneys' fee issue shows that the panel engaged in contract interpretation to come to a new conclusion about the proper conception of fees and costs under the provisions of the Treaties. As explained above, in the Initial Final Award, the panel cited "the applicable Arbitration Clauses" to exclude arbitrators' fees from the fee award and, while it awarded attorneys' fees, also called for submissions on the issue of attorneys' fees; the parties filed substantive submissions, including arguments about the panel's authority to award fees; and the panel stated in the Final Award that it had considered the parties' positions and arguments set forth in the papers. The question is not whether the panel erred in interpreting the Treaties—it is whether the panel interpreted the Treaties at all. Contrary to the Director's arguments, the panel did not "admit" to abdicating this duty. The panel did not exceed its authority under the Treaties.

## B. The Issue of Attorneys' Fees Was Submitted to the Panel

The parties also dispute whether the issue of attorneys' fees was submitted to the panel. "The parties may limit the arbitrator's contractual authority to address a dispute through: (1) the contract; and (2) the issue submitted to the arbitrator. . . . Parties to an arbitration may stipulate the issues they want determined and increase or limit the arbitrator's contractual authority by their express submission." *Am. Postal Workers*, 185 F.3d at 835 (citation and internal quotation marks omitted). Catalina argues that the parties submitted the issue to the panel, forming an independent basis, apart from the Treaties, for denying the motion to vacate under Section 10(a)(4) of the FAA. Relatedly, the Director argues that since the parties did *not* submit the issue to the panel, the court should modify or correct the award under Section 11(b). Section 11(b) provides that this court may modify or correct an award "[w]here the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted." 9 U.S.C. § 11(b). Both arguments turn on whether the parties submitted the issue of attorneys' fees to the panel.[13]

---

[13] Although the court need not decide this issue, it is unclear whether the question of attorneys' fees (a question about the remedy) had to be submitted separately from the merits issues. *Harper Ins. Ltd. v. Century Indem. Co.*, 819 F. Supp. 2d 270, 277 (S.D.N.Y. 2011) ("Petitioners conflate the question of whether an *issue* was presented to the arbitrators with the question of whether a *potential remedy* was presented to the arbitrators. It is indisputable that arbitrators have no authority to rule on an issue not submitted to them. However, there is no parallel *per se* rule that it is beyond the authority of the arbitrators to issue a remedy directed to an issue squarely before them unless it was requested by one of the parties.") (emphases in original).

This court must uphold the "arbitrator's interpretation of the scope of the issue" if it is "rationally derived from the parties' submission." *Am. Postal Workers Union*, 185 F.3d at 835. Here, the Director itself, in its demand for arbitration, included in the relief requested "attorneys' fees, arbitration costs and interest" and "such further relief as the Panel deems just." (Dkt. 25-1 at 4.) Catalina, in its position statement submitted to the panel before the hearing, included in the relief it sought "costs and fees associated with this arbitration" and "any other relief the Panel deems to be just and proper." (Dkt. 25-2 at 10.)

In addition, both parties included broad and open-ended requests for relief throughout the proceedings. Among a number of examples, the Director's pre-hearing brief requested "any further relief this Panel deems proper." (Dkt. 41-5 at 20.) Catalina's pre-hearing brief requested "costs and fees associated with this arbitration" and "any other relief the Panel deems to be just and proper." (Dkt. 40-7 at 41; *see also* Dkt. 41-3 at 19 (Director's Mot. for Summ. J.) (requesting "any further relief this Panel deems proper"); Dkt. 41-4 at 8 (Director's Reply Supporting Mot. for Summ. J.) (same).)

The Director argues that despite these requests, the parties did not present evidence or argument on the issue until after the hearing, after the panel granted attorneys' fees in the Initial Final Award and called for submissions on the topic. In support of this argument, the Director points to *Davis v. Prudential Sec., Inc.*, 59 F.3d 1186, 1195 (11th Cir. 1995). There, the court held that, in denying attorneys' fees, the arbitrators exceeded their powers and awarded on a matter not submitted to them, relying in part on the fact that the parties did not present "evidence or argument on the issue." *Id.*

Even if the post-hearing briefing did not put the fees in issue, courts have relied on similar initial requests for relief in concluding that the parties submitted the issue of attorneys' fees to arbitrators. *See Certain Underwriters*, 2009 WL 3126288, at *4-5 (party requested attorneys' fees in pre-hearing reply brief; "by seeking a fee award in its own favor, Argonaut effectively acknowledged that the panel has such power"); *F. Hoffmann-La Roche Ltd. v. Qiagen Gaithersburg, Inc.*, 730 F. Supp. 2d 318, 331 (S.D.N.Y. 2010) (party's predecessor in interest "acquiesced to the Panel's power to award fees through its actions at the arbitration," which included requesting fees in its prayer for relief) (citations and internal quotation marks omitted); *Spector v. Torenberg*, 852 F. Supp. 201, 210 (S.D.N.Y. 1994) ("petitioners agreed to the award of such fees by placing a request for 'reasonable attorney's fees' in their demand for arbitration"; "[p]etitioners also acquiesced in the award of such fees" by other actions in the arbitration). *Davis* does not hold otherwise, since there the Statement of Claim (while it requested "costs") made "no request for attorneys' fees." 59 F.3d at 1195.

Here, the Director requested attorneys' fees in its demand initiating the arbitration. The Director observes that the demand was a joint demand "against

Catalina and other reinsurers participating under the Treaties and a number of other reinsurance treaties with different terms that are not applicable here." (Dkt. 42 at 13.) Nonetheless, the demand commenced the arbitration and the panel legitimately could have relied on it. In addition, Catalina requested costs and fees in its pre-hearing position statement. Finally, both parties included broad and open-ended requests for relief throughout the proceedings. The parties submitted the issue of attorneys' fees to the panel.

The court declines to disturb the award under Section 10(a)(4), Section 11(b), or Article V(1)(c), and therefore confirms the award under Sections 9 and 207.

## II. Catalina's Motion for Sanctions

Catalina seeks sanctions under Fed. R. Civ. P. 11 and 28 U.S.C. § 1927, asserting that a reasonably careful attorney would not have believed that the Director's motion to vacate or modify had a chance of succeeding. (Dkt. 44 at 8.)

Rule 11 requires "(1) that a request for sanctions be made in a separate motion rather than as an appendage to another motion or responsive memorandum, and (2) that the party to be sanctioned be given a twenty-one day safe harbor in which to withdraw or correct the allegedly offending filing." *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1058 (7th Cir. 1998) (citing then-Fed. R. Civ. P. 11(c)(1)(A), now in relevant part Rule 11(c)(2)); *see also N. Illinois Telecom, Inc. v. PNC Bank, N.A.*, 850 F.3d 880, 885–89 (7th Cir. 2017); *Boldischar v. Reliastar Life Ins. Co.*, No. 14-cv-06844, 2016 WL 3997596, at *6 (N.D. Ill. July 26, 2016).

Catalina appears to have satisfied these requirements. On May 29, 2019, Catalina sent the Director a letter notifying him of Catalina's intent to seek sanctions under Rule 11 and 28 U.S.C. § 1927. (Dkt. 44-1.) On May 31, the Director agreed to withdraw certain arguments in the Motion. (Dkt. 44-2.) Catalina sent a copy of its motion for sanctions to the Director on June 13 (Dkt. 44-3) and filed it with the court on July 8 (Dkt. 43), more than twenty-one days later. The court need not conclude definitively that Catalina satisfied the procedural requirements of Rule 11, however, because in any event, sanctions are not warranted.

Rule 11(b) provides in relevant part:

**(b) Representations to the Court.** By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party

certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> **(1)** it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> **(2)** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; . . .

Fed. R. Civ. P. 11(b); *see also Brunt v. Serv. Employees Int'l Union*, 284 F.3d 715, 721 (7th Cir. 2002) ("Rule 11 imposes a duty on attorneys to ensure that any papers filed with the court are well-grounded in fact, legally tenable, and not interposed for any improper purpose."); *Cuna Mut. Ins. Soc. v. Office & Prof'l Employees Int'l Union, Local 39*, 443 F.3d 556, 560-61 (7th Cir. 2006); *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 963 (7th Cir. 1993). "Rule 11 does not require that the district court make a finding of bad faith. . . . Instead, the district court need only undertake an objective inquiry into whether the party or his counsel should have known that his position is groundless." *Nat'l Wrecking Co.*, 990 F.2d at 963 (citations and internal quotation marks omitted); *see also Perfection Bakeries, Inc. v. Chauffeurs, Teamsters and Helpers, Local Union No. 414*, 105 Fed. App'x. 102, 104 (7th Cir. 2004).

In addition to "general Rule 11 sanction principles," there is a "long line of Seventh Circuit cases that have discouraged parties from challenging arbitration awards and have upheld Rule 11 sanctions in cases where the challenge to the award was substantially without merit." *Cuna*, 443 F.3d at 561 (citing cases); *see also Johnson Controls*, 712 F.3d at 1028 (noting that "challenges to commercial arbitral awards bear a high risk of sanctions" and that "[a]ttempts to obtain judicial review of an arbitrator's decision undermine the integrity of the arbitral process"); *Cont'l Can Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund*, 921 F.2d 126, 128 (7th Cir. 1990) ("awards of attorneys' fees are readily available when one side refuses to accept an arbitrator's award and loses"); *Hyatt Franchising, L.L.C. v. Shen Zhen New World I, LLC*, 876 F.3d 900, 903 (7th Cir. 2017) ("More than 25 years ago, this court held that commercial parties that have agreed to final resolution by an arbitrator, yet go right on litigating, must pay their adversaries' attorneys' fees.") (citing *Cont'l Can*).

Having considered the Director's arguments and the applicable law, the court does not believe that sanctions are warranted in this case. The Seventh Circuit has distinguished between arguments "over the proper interpretation of the correct legal standard" and "advancing the wrong legal standard altogether." *Perfection Bakeries, Inc. v. Chauffeurs, Teamsters & Helpers, Local Union No. 414*, 105 F.

App'x 102, 105 (7th Cir. 2004); *see also id.* at 107 (making case-specific finding that party's "reasonable attempt to modify or distinguish existing precedent . . . makes Rule 11 sanctions inappropriate in this case"); *Boldischar*, 2017 WL 4046350, at *3. Here, the Director acknowledged that an arbitration award should be enforced when it "draws its essence from the contract," and that an award does so if it is based on the "arbitrator's interpretation of the agreement, correct or incorrect though that interpretation may be." (Dkt. 40 at 5.) The Director cited appropriate cases in support of its arguments and attempted to distinguish the precedent cited by Catalina.

Of course, parties cannot avoid sanctions simply by citing the correct standard and then making arguments that clearly attempt to evade that standard's requirements. *See Halim v. Great Gatsby's Auction Gallery, Inc.*, No. 03-cv-08414, 2007 WL 773286, at *3 (N.D. Ill. Mar. 12, 2007) (granting sanctions when party challenging award "dressed up his arguments concerning his disagreement with the substance of the arbitrator's determination as arguments that the arbitrator had exceeded his authority under the parties' contract"). Unlike in *Halim*, here, the Director's arguments that the panel failed to interpret the Treaties and decided a matter not submitted to the panel were sufficiently grounded in the text of the Treaties and the panel's awards. The court does not find the Director's arguments persuasive, but in this case does not view the arguments as warranting sanctions.

Nor, in the specific circumstances of this case, does the court find that the Director's motion was presented for an improper purpose. The Director winnowed the arguments after receiving Catalina's Rule 11 letter, reflecting an effort to ensure that the arguments on which the Director was proceeding was nonfrivolous. Considering the circumstances of this particular case, the court does not find that the Director's motion was brought to "cause unnecessary delay, or needlessly increase the cost of litigation."

Since sanctions are not warranted under Rule 11, the court also denies the request for relief under 28 U.S.C. § 1927. Section 1927 provides: "Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Section 1927 authorizes sanctions against an attorney who has engaged in a "serious and studied disregard for the orderly process of justice." *Badillo v. Central Steel & Wire Co.*, 717 F.2d 1160, 1166 (7th Cir. 1983) (citations and internal quotation marks omitted). "Because of its penal nature, 28 U.S.C. § 1927 has been strictly construed." *Id.*; *see also Boldischar*, 2017 WL 4046350, at *3 (noting that *Badillo* "cited *West Virginia v. Charles Pfizer & Co.*, 440 F.2d 1079 (2nd Cir. 1971), for the proposition that sanctions under § 1927 are 'highly unusual' and require clear evidence of bad faith"). "Section 1927 is permissive, not mandatory. The court is not obliged to grant sanctions once it has found unreasonable and vexatious conduct. It may do so in its discretion." *Corley*, 388 F.3d at 1014; *see also Bell v. Vacuforce, LLC*, 908 F.3d

1075, 1082 (7th Cir. 2018); *Bommiasamy v. Parikh*, 633 F. App'x. 351, 354 (7th Cir. 2016); *Boldischar*, 2017 WL 4046350, at *3. For the same reasons that apply to the Rule 11 analysis, the Director's motion to vacate or modify the award does not satisfy this demanding standard. *See Boldischar*, 2017 WL 4046350, at *1-3. Catalina's motion for sanctions is denied.

## Conclusion

For the reasons given above, the court grants the petition for confirmation of the arbitration award [1], denies the motion to vacate or modify the final award [40], and denies the motion for sanctions [43]. The arbitration award is converted to a judgment against Respondent.

ENTERED:

Date: April 6, 2020          /s/ Martha M. Pacold